# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERARDO JARAMILLO,<br><br>        Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>        Defendant. | Case No. 1:17-cv-00064-SAB<br><br>ORDER GRANTING IN PART PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER DEVELOPMENT OF THE RECORD<br><br>(ECF Nos. 15, 21, 22) |

**I.**

**INTRODUCTION**

Plaintiff Gerardo Jaramillo ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from borderline intellectual functioning, major depressive disorder, obsessive-compulsive disorder, occipital neuralgia, and asthma. For the reasons set forth below, Plaintiff's Social Security appeal shall be granted in part and remanded for further development of the record.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 9, 10.)

1

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on January 25, 2013, alleging disability beginning June 1, 2010. (AR 188-200.) Plaintiff's applications were initially denied on June 19, 2013, and denied upon reconsideration on October 7, 2013. (AR 120-124, 128-133.) Plaintiff requested and received a hearing before Administrative Law Judge Sharon Madsen ("the ALJ"). Plaintiff appeared for a hearing on April 16, 2015. (AR 30-61.) On May 29, 2015, the ALJ found that Plaintiff was not disabled. (AR 8-20.) The Appeals Council denied Plaintiff's request for review on November 9, 2016. (AR 1-3.)

### A.    Hearing Testimony

Plaintiff appeared with counsel and testified at a hearing on April 16, 2015. (AR 33-56.) He lives with his mother and is able to attend to his personal care. (AR 34-35.) He is able to microwave food, go shopping, and do household chores. (AR 34-35.) He has a driver's license and he drives. (AR 34.) He does not do any social activities. (AR 35.) He has one friend who he sees every 3 weeks when they are both at the post office and they just talk there at the post office. (AR 49-50.) He used to play basketball, but he no longer plays because of his depression. (AR 35.)

During a typical day, he takes his medication, rinses his face, watches TV for 10 minutes, eats a small snack, takes his medication, watches TV for 20 minutes, goes to his room and watches 10 more minutes of TV, and then falls asleep. (AR 35-36.) He only watches TV for 10 to 20 minutes because of his medication. (AR 43.) Even if he was not taking medication, he could not pay attention for longer because the headaches are too much. (AR 43-44.) He does not go outside or go for walks. (AR 36.) He lays down for 8 to 10 hours on "bad days" and 5 hours on "good days." (AR 56.) He needs help managing his finances. (AR 44.)

He graduated from high school, but he has not had any vocational training. (AR 34.) He worked at a laundry service unloading trucks of clothes. (AR 36.) He then worked for a supermarket bagging groceries, stocking shelves, and corralling the carts. (AR 37.) Next, he

worked for Capri Sun packing the boxes of juice pouches. (AR 37-38.) He then worked for a temp agency where he was switched to different jobs. (AR 37.) He worked for an insulation company doing various janitorial work. (AR 38-39.) He also worked as a driver delivering animals like rats, crickets, and mice to pet stores. (AR 39.)

He has headaches every day for 8 hours. (AR 40.) He sometimes gets headaches in one spot and then other times all over his head. (AR 44.) He also has headaches that are "the same thing, but [a] different pain" just above his forehead that come and go and last for 8 to 10 minutes. (AR 55.) The headaches just above his forehead are a very sharp pain as if someone is carving him. (AR 55.) He is not aware of what triggers the headaches. (AR 55.) He takes Gabapentin, which soothes and relaxes his headaches. (AR 40.)

He has depression that makes him really sad and emotional and causes him to stay inside his room. (AR 42.) He gets angry and starts punching the wall in his room for 10 to 20 minutes until he calms down. (AR 42-43, 46.) He does not feel the pain when he is punching, but afterward he feels the pain. (AR 46.) There is no damage to the wall. (AR 52.) He tries to calm himself down, but he "just needed to lay it out." [sic]. (AR 46.) He sometimes gets angry at the people in his house when they tell him to do something like take a shower or change his clothes. (AR 46-47.) He yells at them and then if they keep bugging him, he locks himself in his room. (AR 47.) He takes Paxil and Bupropion for his depression and they help a little bit. (AR 43.) He is in individual counseling where he lets out his thoughts, feelings, and "everything else," which helps. (AR 43.) He never has suicidal thoughts. (AR 54.)

Plaintiff has a problem with meeting people and he does not like being in front of a crowd. (AR 40-41.) When he is in front of a crowd, he gets scared, his heartbeat increases, he gets nervous, he gets cold chills, it feels like something is choking him and he cannot get air, and he feels like he has to go outside and run away from people. (AR 41.) He goes grocery shopping in the mornings when there are not a lot of people. (AR 40-41.) He panicked one time when he went during a busier time. (AR 41.) He has gone into a store and had to leave. (AR 41.) When he starts feeling anxiety, he tries to run through different departments at the store, he waits 10 to 20 minutes until he relaxes, and then he goes outside. (AR 41.) He has had to leave

the store because he was getting angry. (AR 52.) A week before the hearing, he had to leave Walmart because some kids were crying and there was arguing and he felt like yelling at them to quiet down. (AR 53.)

He also gets anxious from talking to a therapist or when he is with a friend. (AR 42.) He feels nervous and shy because his answers do not come out exactly like he is thinking and it is like an anxiety attack. (AR 42.) However, he also says that he has no problem getting along with people he knows. (AR 44.)

He has "good days" and "bad days" when it comes to his anxiety and anger. (AR 50-52.) He has 2 "good days" a week. (AR 51.) A "good day" is a relaxing, calming, joyful, and happy day, but he does sometimes have anxiety attacks during "good days." (AR 51.) He tries to avoid having anxiety attacks by concentrating on happy things. (AR 50-51.) He has anxiety attacks for 20 minutes that occur 4 times a day on "bad days." (AR 50-51.) He also gets angry for 20 minutes on "bad days" and punches the wall. (AR 51-52.) Sometimes during "bad days" when he gets very, very angry, he cuts himself with a knife on the side of his face or body because seeing the blood relaxes him. (AR 53-54.) His doctor told him to put icing on his face instead of cutting himself, but that does not satisfy his urge. (AR 54.) When he has anxiety attacks, he takes Clonazepam. (AR 41.)

He washes his hands a lot. (AR 44.) He washes his hands after using the TV controller, when he makes himself something to eat, and when he touches something. (AR 44-45.) When he goes to a store, he rinses his hands when he enters and uses wipes when he leaves. (AR 45.) He also uses wipes after he grabs items in the store. (AR 45-46.) He feels calm when he uses his wipes. (AR 45.)

A vocational expert, Thomas Dachelet, also testified at the hearing. (AR 56-59.)

**B.      ALJ Findings**

- Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2015.

- Plaintiff has not engaged in substantial gainful activity since June 1, 2010, the alleged onset date.

- Plaintiff has the following severe impairments: borderline intellectual functioning, major depressive disorder, and obsessive-compulsive disorder.

- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.

- Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following nonexertional limitations: Plaintiff can perform simple repetitive tasks with occasional public contact and occasional contact with co-workers and supervisors (work in the same building but not side by side).

- Plaintiff is capable of performing past relevant work as a driver of merchandise, machine operator, stores laborer, and janitor. This work does not require the performance of work-related activities precluded by Plaintiff's RFC.

- Plaintiff has not been under a disability, as defined in the Social Security Act, from June 1, 2010, through the date of the decision.

(AR 11-20.)

**III.**

**LEGAL STANDARD**

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520; Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.

Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not

5

1 disabled.

2 Step three: Does the claimant's impairment, or combination of impairments, meet
or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the
3 claimant is disabled. If not, proceed to step four.

4 Step four: Does the claimant possess the residual functional capacity ("RFC") to
perform his or her past relevant work? If so, the claimant is not disabled. If not,
5 proceed to step five.

6 Step five: Does the claimant's RFC, when considered with the claimant's age,
education, and work experience, allow him or her to adjust to other work that
7 exists in significant numbers in the national economy? If so, the claimant is not
disabled. If not, the claimant is disabled.

8

9 Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

10      Congress has provided that an individual may obtain judicial review of any final decision

11 of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).

12 In reviewing findings of fact in respect to the denial of benefits, this court "reviews the

13 Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

14 disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v.

15 Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).   "Substantial evidence" means more than a

16 scintilla, but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996)

17 (internal quotations and citations omitted).  "Substantial evidence is relevant evidence which,

18 considering the record as a whole, a reasonable person might accept as adequate to support a

19 conclusion."  Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of

20 Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

21      "[A] reviewing court must consider the entire record as a whole and may not affirm

22 simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159 (quoting

23 Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).  However, it is not

24 this Court's function to second guess the ALJ's conclusions and substitute the court's judgment

25 for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is

26 susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be

27 upheld.").

28 / / /

# IV.

## DISCUSSION AND ANALYSIS

Plaintiff contends that the ALJ erred in concluding that his occipital neuralgia is "non-severe" at step two. Plaintiff also contends that the ALJ erred in rejecting the opinion of his treating psychiatrist, Dr. Robert Ensom. Plaintiff seeks remand for further administrative findings. Defendant responds that substantial evidence supports the ALJ's step two determination. Further, Defendant argues that the ALJ appropriately evaluated Dr. Ensom's opinion.

### A. The ALJ's Finding that Occipital Neuralgia is a Non-Severe Impairment is Not Supported by Substantial Evidence

Plaintiff argues that his occipital neuralgia should have been deemed severe at step two because the medical record shows that he consistently sought treatment for his headaches from the time he established care in 2013 through the date of the hearing. Defendant responds that an impairment is not severe at step two just because there is some objective evidence to support the existence of an impairment. Defendant asserts that no medical source opined that Plaintiff's headaches limited him and Plaintiff does not explain why his headaches limited his ability to work. Defendant also argues that the record supports the ALJ's finding that Plaintiff only had sporadic treatment for headaches. In his reply, Plaintiff contends that the ALJ does not point to any medical evidence that establishes that Plaintiff's occipital neuralgia does not have more than a minimal effect on his physical or mental abilities to work.

"An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.' " Smolen, 80 F.3d at 1290 (citations omitted). Step two is a "de minimis screening devise to dispose of groundless claims." Id. An ALJ can only find that claimant's impairments or combination of impairments are not severe when his conclusion is clearly established by medical evidence. Webb, 433 F.3d at 687 (quoting S.S.R. 85-28). In considering an impairment or combination of impairments, the ALJ must consider the claimant's subjective symptoms in determining their severity. Smolen, 80 F.3d at 1290.

Symptoms are not medically determinable physical impairments and cannot by themselves establish the existence of an impairment. Titles II & XVI: <u>Symptoms, Medically Determinable Physical & Mental Impairments, & Exertional & Nonexertional Limitations</u>, SSR 96-4P (S.S.A. July 2, 1996). In order to find a claimant disabled, there must be medical signs and laboratory findings demonstrating the existence of a medically determinable ailment. <u>Id.</u> "[R]egardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings .... In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process." <u>Id.</u>

Here, the ALJ found that Plaintiff's occipital neuralgia is a slight impairment that has only minimal, if any effect on his ability to work. (AR 13.) The ALJ also found that "[t]here is no evidence that [the occipital neuralgia] [has] required more than sporadic medical treatment or resulted in any medical complications." (AR 13.)[2] In February 2015, an MRI of Plaintiff's head revealed a vascular malformation with a small lesion present in his right frontal lobe. (AR 386-387.) A review of the record reveals that Plaintiff complained of headaches numerous times, was prescribed increasing dosages of medication, and referred to physical therapy twice.

On July 10, 2013, Plaintiff saw Dr. Derik Keshishian for a sharp headache in the back of his head on the right side. (AR 375.) The headache occurs every other hour for 10-15 minutes every 3 to 4 days. (AR 375.) He was prescribed Gabapentin and Indomethacin. (AR 376.)

On October 4, 2013, Plaintiff had a follow-up visit with Dr. Keshishian and complained that Indomethacin was making the headaches worse. (AR 470.) However, Plaintiff reported that Gabapentin was helping his headaches so he was continued on Gabapentin. (AR 470-471.)

On December 9, 2013, when Plaintiff was seen after his gallbladder surgery by Dr.

_____

[2] While Defendant asserts that Plaintiff's recommended treatment was conservative and at least partly effective, the ALJ did not give these as reasons, and therefore the Court cannot consider these post hac reasons. <u>See</u> <u>Ceguerra v. Sec'y of Health & Human Servs.</u>, 933 F.2d 735, 738 (9th Cir. 1991).

8

Keshishian, Plaintiff stated that he had not had a headache and shooting pains in his head for approximately a month. (AR 430.) Plaintiff reported the Gabapentin was helping his headaches and he was continued on it. (AR 430.)

On January 29, 2014, Plaintiff was seen by Dr. Ramiro Francisco Jose Guerrero because of his history of daily headaches in the fronto-parietal area and Plaintiff was continued on Gabapentin. (AR 552-554.) On March 3, 2014, Plaintiff was seen by Dr. Guerrero after a negative CT scan. (AR 548.) Plaintiff was taking medication with no side effects and had no change in his headaches in his occipital area for the past four years. (AR 548.) Plaintiff was continued on Gabapentin. (AR 548-550.)

In April 2014, Plaintiff saw Dr. Vladimir Royter, a neurologist, for an electrode shock like sensation in the back of his head. (AR 14, 544.) Dr. Royter diagnosed Plaintiff with bilateral occipital neuralgia and recommended physical therapy and an increase of Gabapentin. (AR 14, 547.) Dr. Royter increased Plaintiff's Gabapentin again in May 2014 after Plaintiff said that the pain is "quite the same" and he had no significant side effects on Gabapentin. (AR 539.)

Dr. Guerrero saw Plaintiff on June 3, 2014, and there is a note that Plaintiff's mother had some concern with the Gabapentin. (AR 533.) On June 6, 2014, Plaintiff did say that his headache pain is cured by Gabapentin. (AR 496.)

Plaintiff attended 8 physical therapy sessions from June 19, 2014, through July 23, 2014. (AR 489-509.) During his last session on July 23, 2014, Plaintiff reported that he has 8/10 right neck pain, 9/10 at worst, and 0/10 at best, and that he has worsened to 5% of normal from the starting point of 10-15% of normal. (AR 489.) Plaintiff was having daily headaches and his physical therapist said he would benefit from further evaluation with regard to his ongoing headaches. (AR 489.)

On July 28, 2014, Plaintiff saw PA Vagan Chakarian with a headache in the occipital area that felt like pressure, tightness, and an aching feeling. (AR 531.) The severity was mild, but the intensity fluctuated. (AR 531.) Plaintiff was continued on Gabapentin 900 mg. (AR 532.) On September 29, 2014, Plaintiff reported that he had partial improvement of his occipital neuralgia and no side effects with Gabapentin. (AR 388.) PA Chakarian continued Plaintiff on

1   Gabapentin 900 mg and told him to continue physical therapy.  (AR 389.)

2           Plaintiff then attended physical therapy from October 15, 2014, through November 24,

3   2014.  (AR 473-486.)  During the initial evaluation on October 15, 2014, Plaintiff stated that his

4   headaches have progressed to happening daily and they are mainly on the back of his head with

5   an electrical shock type sensation.  (AR 477.)  He stated that Gabapentin 900 mg relieves his

6   headache pain.  (AR 482.)  On November 24, 2014, Plaintiff ended his physical therapy because

7   he felt it was not helping him.  (AR 473.)

8           On November 24, 2014, Plaintiff saw PA Chakarian for his generalized mild headache

9   that is aching, dull, sharp, and causes pressure.  (AR 393.)  Plaintiff had partial improvement

10  since his September 29, 2014 visit and no side effects with his medication.  (AR 393.)  Plaintiff's

11  Gabapentin was increased to 1200 mg.  (AR 394.)  On January 12, 2015, PA Chakarian noted

12  that Plaintiff's headache is generalized and located in the right and occipital area and Plaintiff

13  has chronic cervical occipital pain.  (AR 390.)  Plaintiff reported a new onset of a new kind of

14  headache that is sharp and stabbing in the temporal and parietal areas.  (AR 390.)  Plaintiff also

15  complained of low cervical-upper thoracic spinal pain that is sharp and stabbing.  (AR 390.)

16  Plaintiff was diagnosed with chronic headache disorder and cervico-occipital neuralgia and

17  continued on Gabapentin 1200 mg.  (AR 391.)

18          Therefore, Plaintiff repeatedly reported headaches and he was being treated for his

19  headaches consistently from July 2013 through the date of the hearing.  The record does not

20  support the ALJ's finding that Plaintiff had only sporadic medical treatment for his occipital

21  neuralgia.  Furthermore, Plaintiff testified that he could not pay attention for longer than 10 to 20

22  minutes because the headaches are too much.  (AR 43-44.)

23          Accordingly, the Court finds that there is not substantial evidence in the record to support

24  the ALJ's finding that Plaintiff's occipital neuralgia is non-severe at step two.  However,

25  Defendant asserts that any error in finding Plaintiff's occipital neuralgia non-severe at step two is

26  harmless.  The ALJ's decision will not be reversed for errors that are harmless.  Burch, 400 F.3d

27  at 679.

28          Defendant argues that there is harmless error because the ALJ found that even if weight

1   were given to the opinions of Dr. Rustom Damania and Dr. Wong, Plaintiff could still perform

2   substantial gainful activity. Plaintiff asserts that the error is not harmless because the RFC

3   assessment was limited to only Plaintiff's mental impairments. Plaintiff also contends that there

4   is no indication that the ALJ considered Plaintiff's occipital neuralgia when determining the

5   RFC.

6        Defendant points out that Dr. Damania and Dr. Wong's opinions are the only ones in the

7   record that found physical limitations.[3] On April 12, 2013, Dr. Damania, the consultative

8   examiner, found that Plaintiff could do medium work. (AR 352.) On October 4, 2013, Dr.

9   Wong, the state agency reviewing physician, found that Plaintiff had environmental limitations

10   due to asthma, but no physical restrictions due to headaches. (AR 98-99, 112-113.)

11        However, the April 12, 2013 consultative opinion and October 4, 2013 state agency

12   reviewing opinion occurred prior to most of Plaintiff's doctor's visits and treatment for his

13   headaches. The opinions also occurred prior to Plaintiff's February 2015 MRI that revealed

14   medial right frontal superficial vascular malformation. There is no evidence in the record that

15   any physician has reviewed these objective findings to opine the limitations that they would

16   impose on Plaintiff.

17        Furthermore, after finding Plaintiff's headaches and occipital neuralgia non-severe, the

18   ALJ ignored any possible limitations resulting from the allegedly non-severe occipital neuralgia.

19   There is no indication that any limitations from the occipital neuralgia were considered by the

20   ALJ in formulating the RFC. Thus, the Court cannot find that the ALJ's error is harmless.

21       **B.**     **The ALJ Incorporated Dr. Ensom's Opinion into the RFC**

22        Plaintiff argues that the ALJ erred by failing to provide specific and legitimate reasons

23   for rejecting Dr. Ensom's opinion. Defendant responds that there is no error because Dr.

24   Ensom's opinion is actually consistent with the RFC. Defendant also contends that the ALJ

25   provided specific and legitimate reasons to reject Dr. Ensom's opinion. Plaintiff replies that the

26

27   [3] The only other opinion in the record regarding Plaintiff's physical impairments was the April 18, 2013 opinion by
state agency reviewing physician Dr. W. Jackson, who found that the evidence does not support any severe physical

28   medically determinable impairments. (AR 68, 81.)

ALJ did not take into account some of the limitations that Dr. Ensom opined.

A claimant's RFC is "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1). The RFC is "based on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1). "The ALJ must consider a claimant's physical and mental abilities, § 416.920(b) and (c), as well as the total limiting effects caused by medically determinable impairments and the claimant's subjective experiences of pain, § 416.920(e)." Garrison v. Colvin, 759 F.3d 995, 1011 (9th Cir. 2014). At step four the RFC is used to determine if a claimant can do past relevant work. Garrison, 759 F.3d at 1011. "In order for the testimony of a VE to be considered reliable, the hypothetical posed must include 'all of the claimant's functional limitations, both physical and mental' supported by the record." Thomas, 278 F.3d at 956.

The ALJ considered the opinion of Dr. Ensom. (AR 17.) Dr. Ensom was Plaintiff's treating psychiatrist who first examined Plaintiff in December 2013 and continues to see him every 3 months. (AR 399-401, 406-428, 565-567.) Dr. Ensom opined that Plaintiff's significant mood swings and social isolation would impair Plaintiff's ability to perform full time work, week after week. (AR 565.) Plaintiff has difficulty communicating with people, has difficulty understanding people, becomes easily angered and frustrated, has the urge to hit others, and experiences anxiety, anger, and panic attacks that would impair his ability to function in a working environment. (AR 565-567.) Plaintiff has difficulty socializing or tolerating large crowds, has difficulty communicating with people and cannot work in crowded places due to anxiety, and is not able to go out in public with large crowds without experiencing sweats, shaking, nausea, dizziness, and fainting. (AR 565-567.)

The ALJ did not give special weight to Dr. Ensom's opinion regarding Plaintiff's ability to perform past work or any work because it is not an opinion as to the nature and severity of Plaintiff's impairment. (AR 17.) The ALJ found that Dr. Ensom's opinion that Plaintiff is unemployable is a conclusory statement that does not include specific work-related limitations or the medical evidence to support the cause for the limitations. (AR 17.) The ALJ limited Plaintiff to simple repetitive tasks with occasional public contact and occasional contact with co-

12

1  workers and supervisors where Plaintiff works in the same building, but not side-by-side with

2  them. (AR 16.)

3      While Plaintiff argues that the RFC assessment did not contain the limitations assessed

4  by Dr. Ensom, the RFC findings need not be identical to the relevant limitations but must be

5  consistent with them. Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1223 (9th Cir. 2010);

6  Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008). Therefore, the question is

7  whether the RFC is consistent with the limitations opined by Dr. Ensom.

8      Plaintiff contends that Dr. Ensom's opinion that Plaintiff has problems communicating

9  with people and difficulty understanding them was not accounted for in the RFC. While Dr.

10  Ensom opined that Plaintiff would have difficulty communicating with and understanding

11  people, he did not opine that Plaintiff could never do these things or that Plaintiff had no ability

12  to do these things. (AR 565.) The limitation for simple repetitive tasks with occasional public

13  contact and occasional contact with co-workers and supervisors is consistent with Dr. Ensom's

14  opinion that Plaintiff has problems communicating with people and difficulty understanding

15  people.

16      Plaintiff also contends that the RFC does not address Dr. Ensom's opinion that Plaintiff's

17  anxiety, mood swings, and panic attacks would impair Plaintiff's ability to sustain attendance

18  and adapt to everyday stresses in a work environment. Plaintiff points out that the VE testified

19  that there is no work available for a person that misses 4 days of work a month. (AR 58.)

20  However, Dr. Ensom did not opine that Plaintiff's ability to sustain attendance was affected.

21  (AR 565-566.) Dr. Ensom opined that Plaintiff's mood swings and social isolation would impair

22  Plaintiff's ability to perform full-time work, week after week. (AR 565.) Dr. Ensom found that

23  Plaintiff's ability to adapt to stresses common to the normal work environment is impaired and

24  Plaintiff gets anxiety and panic attacks under pressure and angry in public and social situations.

25  (AR 566.) The ALJ translated Dr. Ensom's opinion regarding Plaintiff's social issues, such as

26  difficulty with crowds, becoming easily angered and frustrated and getting the urge to hit others,

27  and Plaintiff's mood swings and social isolation into the limitation of occasional public contact

28  and occasional contact with supervisors and coworkers where Plaintiff works in the same

13

1  building, but not side-by-side with them.

2      Therefore, the Court finds that Dr. Ensom's opinion is consistent with the RFC assessed

3  by the ALJ and the ALJ did not err in evaluating Dr. Ensom's opinion.

4          **C.      The Matter is Remanded for Further Administrative Proceedings**

5      The ordinary remand rule provides that when "the record before the agency does not

6  support the agency action, ... the agency has not considered all relevant factors, or ... the

7  reviewing court simply cannot evaluate the challenged agency action on the basis of the record

8  before it, the proper course, except in rare circumstances, is to remand to the agency for

9  additional investigation or explanation." Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d

10  1090, 1099 (9th Cir. 2014). This applies equally in Social Security cases. Treichler, 775 F.3d at

11  1099. Under the Social Security Act "courts are empowered to affirm, modify, or reverse a

12  decision by the Commissioner '*with or without* remanding the cause for a rehearing.' " Garrison,

13  759 F.3d at 1019 (emphasis in original) (quoting 42 U.S.C. § 405(g)). The decision to remand

14  for benefits is discretionary. Treichler, 775 F.3d at 1100. In Social Security cases, courts

15  generally remand with instructions to calculate and award benefits when it is clear from the

16  record that the claimant is entitled to benefits. Garrison, 759 F.3d at 1019.

17      The Ninth Circuit has "devised a three-part credit-as-true standard, each part of which

18  must be satisfied in order for a court to remand to an ALJ with instructions to calculate and

19  award benefits: (1) the record has been fully developed and further administrative proceedings

20  would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for

21  rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly

22  discredited evidence were credited as true, the ALJ would be required to find the claimant

23  disabled on remand." Garrison, 759 F.3d at 1020. The credit as true doctrine allows "flexibility"

24  which "is properly understood as requiring courts to remand for further proceedings when, even

25  though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a

26  whole creates serious doubt that a claimant is, in fact, disabled. Id. at 1021. Even when the

27  circumstances are present to remand for benefits, "[t]he decision whether to remand a case for

28  additional evidence or simply to award benefits is in our discretion." Treichler. 775 F.3d at 1102

1  (quoting <u>Swenson v. Sullivan</u>, 876 F.2d 683, 689 (9th Cir. 1989)).

2        In this instance, Plaintiff seeks remand for further development of the record.  The Court

3  finds that the record has not been sufficiently developed to determine what, if any, functional

4  limitations Plaintiff has due to his occipital neuralgia.  Accordingly, this action shall be

5  remanded for further development of the record.  On remand, the ALJ shall obtain physician

6  review of the medical evidence regarding Plaintiff's occipital neuralgia to determine the limiting

7  effects of the occipital neuralgia in determining his residual functional capacity.

8                                            **V.**

9                              **CONCLUSION AND ORDER**

10       Based on the foregoing, the Court finds that the ALJ erred in finding Plaintiff's occipital

11  neuralgia a non-severe impairment at step two and this error is not harmless.  However, the

12  Court finds that the ALJ properly translated Dr. Ensom's opinion into the RFC.

13       Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

14  Commissioner of Social Security is GRANTED IN PART, and this matter is REMANDED for

15  further administrative proceedings consistent with this opinion.  It is FURTHER ORDERED

16  that judgment be entered in favor of Plaintiff Gerardo Jaramillo and against Defendant

17  Commissioner of Social Security.  The Clerk of the Court is directed to CLOSE this action.

18

19  IT IS SO ORDERED.

20  Dated:   **February 14, 2018**
                                              _____
21                                            UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28

15